IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

KEDDRICK BROWN and
MICHELLE BOST, on behalf of
themselves and those similarly
situated,

      Plaintiffs,

v.

PROGRESSIVE MOUNTAIN
INSURANCE COMPANY and
PROGRESSIVE PREMIER
INSURANCE COMPANY OF
ILLINOIS,

      Defendants.

CIVIL ACTION FILE

NUMBER 3:21-cv-175-TCB

**O R D E R**

This case comes before the Court on the motion [143] of

Progressive Insurance Company and Progressive Premier Insurance

Company of Illinois (collectively "Progressive") to exclude portions of the

expert testimony of Dr. Michelle Lacey and the motions [146, 148] of

Plaintiffs to exclude portions of the expert testimonies of Marc Spizzirri

and Dr. Jonathan Walker.

## I.    Background

The factual background of this case has been detailed on multiple occasions; the Court will be brief here.[1]

This is a class action brought against Progressive alleging breach of contract and breach of the covenant of good faith and fair dealing. Plaintiffs base these claims on an adjustment called the "projected sales adjustment" ("PSA") that Progressive adds when determining the market value of a used car.

When a car is totaled, Progressive is required by the policy to pay the insured the actual cash value ("ACV") of the vehicle at the time of the loss. Progressive uses valuation reports produced by Mitchell International, Inc. ("Mitchell") to determine the ACV of the vehicles. In making these valuation reports, Mitchell uses a software called WorkCenter Total Loss ("WCTL") and finds comparable vehicles for sale on internet listings. It then adjusts these listed prices to account for differences in mileage, features, and equipment. Mitchell also applies a

---

[1] For a fuller background explanation, see the Court's order on class certification. [109].

PSA to account for allegedly customary downward price negotiations that the average buyer works out with the dealer.

Plaintiffs argue that the application of the PSAs is a breach of contract because these downward adjustments are not the norm in the used-car market, and thus the resulting ACVs do not reflect the market price of the vehicles. For damages purposes, Plaintiffs assert that a vehicle's ACV can be determined simply by excising the PSA from the Mitchell valuation report.

Progressive counters that dealerships do customarily negotiate downwards, so they have not underpaid Plaintiffs the market values of their vehicles.

Progressive also contests Plaintiffs' version of calculating damages. It argues that simply excising the PSA from the Mitchell report is not a true calculation of a vehicle's ACV.

The Court certified the class in August 2023 and denied Progressive's motion for summary judgment in February 2024. The Court conducted a hearing on the subject motions on June 18. The case is set to go to trial in early 2025.

## II.    Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert

testimony and provides as follows:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if: (a) the expert's scientific, technical, or
> other specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue; (b) the
> testimony is based on sufficient facts or data; (c) the testimony
> is the product of reliable principles and methods; and (d) the
> expert has reliably applied the principles and methods to the
> facts of the case.

In *Daubert v. Merrell Dow Pharmaceutical, Inc.*, the Supreme

Court made clear that Rule 702 requires district courts to perform a

critical "gatekeeping" function concerning the admissibility of all expert

testimony. 509 U.S. 579, 597, 589 n.7 (1993).

As a part of this gatekeeping inquiry, a district court must consider

whether (1) the expert is qualified to testify about the matters he

intends to address; (2) the expert's methodology is reliable enough under

*Daubert*; and (3) the expert's testimony assists the trier of fact to

understand the evidence or to determine a fact in issue. *Quiet Tech. DC-

8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340–41 (11th Cir.

2003). "While there is inevitably some overlap among the basic

requirements—qualification, reliability, and helpfulness—they remain distinct concepts and the courts must take care not to conflate them." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

An expert must be qualified. Rule 702 provides that an expert can be qualified by "knowledge, skill, experience, training, or education." This is an elastic standard. The Advisory Committee's Note to the 2000 Amendments emphasize that "[n]othing in this amendment is intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony." *See also Frazier*, 387 F.3d at 1260–61 ("While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status."). Indeed, "[t]he qualification standard for expert testimony is 'not stringent,' and 'so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility.'" *Paris v. Progressive Am. Ins.,* No. 2:19-21761-WPD, 2020 WL 9351208, at *1 (S.D. Fla. Oct. 8, 2020) (quoting *Kilpatrick v. Breg, Inc.*, No. 08-cv-10052-KMM, 2009 WL 2058384, at *3 (S.D. Fla. June 25, 2009)).

An expert must also be reliable. Even if an expert is sufficiently qualified, his opinion must be supported by "appropriate validation—i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. A court is not concerned with whether the expert's conclusions are correct, but whether the methods used to reach those conclusions are trustworthy. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) ("[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable.").

"Thus, the inquiry into reliability must focus on 'principles and methodology' and not the expert witness's conclusions." *Colardo-Keen v. CorrectHealth, LLC*, No. 1:14-cv-489-MHC, 2022 WL 18777379, at *4 (N.D. Ga. June 7, 2022) (quoting *Daubert*, 509 U.S. at 595). The trial judge has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Lastly, an expert's testimony must help the trier of fact. An expert's testimony will assist the fact finder if it "concerns matters that are beyond the understanding of the average layperson." *Id.* An expert's

testimony must be relevant to an issue in the case to be helpful. *See Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009) ("The party offering the expert testimony has the burden of demonstrating that the testimony is 'relevant to the task at hand' and 'logically advances a material aspect' of its case." (quoting *Daubert*, 509 U.S. at 597)).

A district court judge is "charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1250 (11th Cir. 2007). While this inquiry must be thorough, it is important that the judge not "supplant the adversary system or the role of the jury.'" *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001) (quoting *Allison v. McGhan*, 184 F.3d 1300, 1311 (11th Cir. 1999)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Indeed, "[i]n discussing this rule, the Advisory Committee Notes state that, after *Daubert*, 'the rejection of expert testimony is the exception rather than the rule.'" *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 850 (11th Cir.

2021) (citing Fed. R. Evid. 702 Advisory Committee's Note to 2000

Amendments).

## III. Discussion

### A. Dr. Michelle Lacey

Defendants seek to exclude certain portions of Dr. Michelle Lacey's

expert testimony at trial. Dr. Lacey is a statistician with a Ph.D. from

Yale University and is a professor in the mathematics department at

Tulane University. Plaintiffs contend that she is offering three main

opinions:

> (1) the data that purportedly supports Progressive's PSA is unsound; (2) the impact of the PSA on each class member's total loss recovery can be calculated from a review of the Mitchell report that Progressive used to value Plaintiffs' and each class member's vehicle; and (3) class members can be identified from Progressive's own data and documents.

[165] at 6.

Progressive seeks to exclude Dr. Lacey's opinions on: (1) damages;

(2) accounting for condition adjustments if PSAs are excised from

Mitchell valuation reports; (3) identifying class members; and (4) the

average PSA.

8

### 1.    Damages

First, Progressive argues that Dr. Lacey ought to be precluded from opining on damages, as she has admitted that she is not an expert on damages. Progressive does not specify which parts of her testimony it is contesting here, so the Court will consider the sections cited by Plaintiffs in their brief in opposition. *See* [165] at 9.

In her report, Dr. Lacey describes how to calculate "[t]he decrease in actual cash value due to the application of the [PSA]" and how to calculate the prejudgment interest. [144-2] at 13. She states that she learned that these were the measures of damages from the consolidated amended complaint. *Id.* at 12. Dr. Lacey also explains how to calculate Mitchell's condition adjustments from valuation reports. [89-6] at 6.

The Court finds that Dr. Lacey is sufficiently qualified to give these opinions. Dr. Lacey is a highly credentialed statistician, and each of the above opinions centers on how to calculate a certain value. Dr. Lacey explicitly acknowledges that she did not create the damages model; the jury will learn about that from Plaintiffs' appraisal expert Jason Merritt. If the jury opts to accept Merritt's damages model, Dr. Lacey will step in to explain the mathematical formula. Performing

mathematical computations is well within her expertise as a statistician, and she is qualified to give these opinions. Progressive's motion on this point will be denied.

### 2.  Condition Adjustments

When the WCTL report is calculated, the technology applies a "condition adjustment" that alters the ACV to account for each car's unique conditions, such as mileage and mechanical issues.

Both parties agree that removing the PSA from the WCTL report will cause a change to the condition adjustment. Dr. Lacey states that this can easily be accounted for because the condition adjustments are applied as a percentage of the base value, and so it is easily applied to the new ACV minus the PSA. *See* [144-4] at 6.

Progressive contends that Dr. Lacey's opinion on this point ought to be excluded because it does not help the jury and is unreliable.

First, Progressive argues that Dr. Lacey's calculations are "simple addition and division" for which the jury does not need an expert to assist their understanding. [168] at 4. At the hearing, Plaintiffs pointed out that her expertise is needed because of the number of people in the class.  Dr. Lacey uses statistical methods to make calculations that

would take the average person a long time, simply because this case involves many people. The Court agrees with Plaintiffs that Dr. Lacey's calculations and explanations are helpful to the jury and that Progressive's argument on this point lacks merit.

Next, Defendants argue that Dr. Lacey's opinion is unreliable because the testimony is outside the scope of her expertise, and she does not know how condition adjustments are calculated. Progressive contends that Dr. Lacey did not conduct her own research into the issue and instead relied on a ten-year-old report ("the Barnett report") provided to her by Plaintiffs' counsel. Progressive criticizes Dr. Lacey for not looking into whether the report was accurate regarding condition adjustments.

First, Dr. Lacey is not an expert in Mitchell's valuation process, so she is not expected to opine on how condition adjustments are calculated. That would be beyond the point of her testimony; she is not concerned with how the condition adjustment is determined for a particular vehicle, but how excising the PSA would affect the condition adjustment. Dr. Lacey has shown that she understands how condition adjustments are calculated into the base value based on the Barnett

report, and therefore her testimony is reliable. Progressive is allowed to question Dr. Lacey on this during cross-examination, but her testimony is admissible.

The Court is also satisfied that the Barnett Report is a reliable source. For one, experts are allowed to rely on materials they did not personally create, and they need not verify the materials' contents. *See Krakauer v. Dish Network, LLC*, No. 1:14-cv-333, 2015 WL 5227693, at *9 (M.D.N.C. Sept. 8, 2015) ("[A]n expert may rely on data that she did not personally collect and need not have conducted her own tests.") (quotations and citation omitted); *Bryan v. John Bean Division FMC Corp.*, 566 F.2d 541, 545 (5th Cir. 1978) (affirming that "experts often rely on facts and data supplied by third parties"). Further, Dr. Lacey is not just parroting the report; she is using the report as a basis for determining how condition adjustments are calculated, but she does her own calculations to demonstrate how removing the PSA impacts the base value and condition adjustment. As stated above, the relevant information for this case is not how the condition adjustments are themselves calculated but how removing the PSA impacts the condition

adjustments. The Barnett report explains the former, but Dr. Lacey uses her expertise to explain the calculations behind the latter.

In the end though, Progressive does not really dispute the underlying Barnett report. Nowhere in its motion does Progressive criticize the contents of the report. Further, Mitchell's Rule 30(b)(6) witness, Phillip Kroell, referred to the Barnett report as a "validation study" of the WCTL methodology and used it to prepare for his testimony. [60-4] at 34:12–14 ("We had a validation study done. I can point you to . . . the Barnett report.").[2]

Progressive points to statements in Phillip Kroell's declaration to argue against the validity of Dr. Lacey's conclusions,[3] but it can do that on cross-examination. It is not the Court's prerogative to delve into the merits of Dr. Lacey's conclusion on a *Daubert* motion; as Progressive itself admits, "Daubert does not focus on whether an expert was right or wrong—the analysis focuses on reliability." [168] at 8 n.3. Progressive

---

[2] As with many depositions referenced here, Kroell's deposition was taken in a different case that deals with similar issues regarding Progressive's use of the PSA. For cost and efficiency, the parties chose not to take his deposition in this case, but the Court will consider his deposition and the depositions of other experts from the other cases throughout this Order.

[3] Note, still not disputing the underlying Barnett report.

can make its points on cross-examination, but its objections go to the weight of the evidence, rather than admissibility.

The Court is convinced that the report is helpful and reliable, and Dr. Lacey's opinions relying on it will not be excluded.

### 3.   Class Members

Progressive next argues against Dr. Lacey's testimony identifying class membership. In her report, Dr. Lacey states that she has been provided with the class definitions and argues that she can deduce who is a class member based on a review of data in Progressive's claims system database and the Mitchell reports for each class member. *See* [144-2] at 9. Progressive argues that this testimony is outside her expertise as a statistician and is also unreliable.

Plaintiffs counter that this argument is moot because Dr. Lacey's opinion on this point was used to support their motion for class certification, and now, identifying class members "is not relevant to any triable issue." [165] at 21. Because this relates to a pending issue before the Court regarding trial bifurcation, the Court will not base its holding on this argument. *See* [176]. Rather, the Court finds that Dr. Lacey is

qualified to opine on this subject and that her testimony is reliable enough to be admitted.

Dr. Lacey is qualified to opine on this subject, as she is analyzing a data set. This is well within her expertise as a statistician. She is not simply parroting the numbers but applying a filtered definition and determining whether the numbers before her fit.

As for Progressive's objection that Dr. Lacey cannot reliably identify the class members, the Court is satisfied that Dr. Lacey is sufficiently versed in this, and Progressive's arguments to the contrary are easily handled through cross-examination. Progressive cites several instances in Dr. Lacey's depositions where she cannot identify class members based on the two documents she cites. In their brief in opposition, Plaintiffs explain why one of Progressive's examples is inapt. This type of dispute is a subject better handled at trial, and Progressive's objections go to the weight of her testimony, not its admissibility. *See Jones v. Otis Elevator Co.*, 861 F.2d 655, 663 (11th Cir. 1988) (finding that "as long as a logical basis exists for an expert's opinion and the inadequacies are fully disclosed to the jury, the weaknesses in the underpinnings of the opinion go to the weight and not

the admissibility of the testimony."). Progressive's motion on this ground will be denied as well.

### 4.   Average PSA

Lastly, Progressive seeks to exclude Dr. Lacey's opinion about the average PSA. In her expert report, Dr. Lacey states that for 148 sample claims, "the average adjustment was $627.93 (median $593.42) with an average reduction in base market value of 7.6% (median 7.1%)." [144-2] at 14. She bases these numbers on a spreadsheet that contained the information in the Mitchell valuation reports for those claims. *See* 144-2 at 33–35.

Progressive argues that this opinion is unreliable because Dr. Lacey did not create the spreadsheet upon which she relied, nor did she validate it. In its reply brief, Progressive makes the additional argument that the opinion ought to be excluded because it is irrelevant and unhelpful since it does not relate to proving liability or damages. The Court does not find these arguments persuasive, and thus Progressive's motion on this point will be denied.

First, the spreadsheets are reliable. As Plaintiffs point out, Progressive never identifies an actual error in the spreadsheet in its

motion or reply brief. If Progressive does find an error, it can bring that up on cross-examination. *See McGarity v. FM Carriers, Inc.*, No. cv-410-130, 2012 WL 1028593, at *7 (S.D. Ga. Mar. 26, 2012) ("the identification of flawed data or facts relied upon by an expert is precisely the role of cross-examination and does not render expert testimony inadmissible under *Daubert*.") (citation omitted).

Dr. Lacey is also allowed to rely on a spreadsheet provided to her by counsel. *See, e.g.*, *Page v. Admiral Craft Equip. Corp.*, No. 9:02-cv-15, 2003 WL 25685212, at *2 (E.D. Tex. July 10, 2003) ("Experts . . . are not investigators, nor are they lawyers and thus must rely on facts already discovered by the attorneys. To require otherwise would be inefficient and a waste of both parties' money and time."). This principle is even more apt in this case because the data came from Progressive itself.

The cases Progressive cites are distinguishable. *See Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000) (affirming excluding an expert's testimony based in part on expert's reliance on data compiled by the plaintiff, but the data was also proven to have many errors and the expert was unreliable for many other reasons as well); *Goldberg v. Fla. Int'l Univ. Bd. of Trs.*, No. 18-20813-civ, 2019 WL 692780, at *3 (S.D.

Fla. Feb. 7, 2019) (excluding the expert opinion as unreliable because the underlying data was supplied from the plaintiff); *Loy v. Rehab Synergies, LLC*, 558 F. Supp. 3d 402, 414–15 (S.D. Tex. 2021) (excluding expert's testimony because the underlying spreadsheet had many errors and manipulations); *Williams v. Hargrove*, No. 1:16-cv-266-KS-MTP, 2018 WL 1075041, at *2 (S.D. Miss. Feb. 27, 2018) (excluding expert opinion because spreadsheet had multiple errors).

As to relevance, Progressive is correct that Plaintiffs may not rely on averages to prove liability or damages. But that is not what Plaintiffs intend to use this testimony for, as Plaintiffs have a theory of liability that can show the jury the exact value of class members' vehicles. Rather, Plaintiffs assert that this opinion will be used to "inform the jury of the average *impact* the PSA had on absent class members' WCTL valuations." [165] at 20. The Court finds that this explanation satisfies the low bar of relevance and therefore will not exclude the opinion.

## B.    Marc Spizzirri

Plaintiffs move to exclude the testimony of Progressive's expert Marc Spizzirri regarding surveys he conducted, as well as the surveys themselves.

Progressive offers Spizzirri as a rebuttal expert on the used car industry to Plaintiffs' witness, Kirk Felix. Spizzirri will testify that the PSA is reasonable and consistent with industry practice.

Spizzirri has worked in the automotive sales industry for over forty years. He has worked at dealerships in various roles, including sales team captain and used car manager. He has also owned and operated his own dealerships. Now Spizzirri does auto-related consulting. He is an independent contractor for B. Riley Advisory Services Group ("B. Riley"), the firm used by Progressive for expert work here.

Spizzirri's report claims that vehicles often sell for below list prices. Progressive argues that this opinion is based on his industry experience, and he conducted his own market research to test his theory.

### 1.    Studies at Issue

Let's first start with a brief explanation of the studies that Spizzirri conducted. There are two main research projects at issue: (1) an in-person questioning of dealers at the National Automobile Dealer Association ("NADA") Convention ("NADA survey"), and (2) a questioning of dealers over the phone and email ("virtual survey").

### a.   NADA Survey

Here are the basics of this study: pollsters interviewed dealers present at the 2022 NADA convention in Las Vegas, Nevada, and asked them a series of questions Spizzirri wrote. Dealers were identified based on whether they were wearing a NADA dealer badge.

The first and most important question, according to Spizzirri, was whether the dealership follows "a strict 'one price' process for selling used vehicles." [158] at 12. Spizzirri's script provided follow-up questions depending on the respondent's answer. Not every person questioned answered all nine questions in the script.

Spizzirri designed this study but used outside vendors to execute it. He retained Noot Marketing Agency to conduct the study. Noot then selected the PUSH agency, an event staffing company, to conduct the polls. Noot provided the potential pollsters for Spizzirri's review.

Spizzirri gave the contractors the instructions. He emphasized that the first question was the most important. He also sent a representative from B. Riley to oversee the study at the convention.

The pollsters received 254 responses, which were summarized in a spreadsheet.

### b.   Virtual Survey

The other study involved contractors contacting car dealerships via email or telephone and acting like he or she was interested in purchasing a specific car. The contractors were instructed to ask, "Will you consider a price lower than the advertised/listed price?"

If the dealership answered yes, the contractor asked for the level of discount they could expect. If the dealership answered no, the contractor would ask a series of follow-up questions including whether the dealership followed a strict one-price sales policy.

The contractors logged their interactions in a spreadsheet and documented their conversations with screenshots.

Again, Spizzirri designed this study but used Noot to conduct it. Noot then used an online company called Fiverr to find freelance contractors. Noot selected contractors based on their interest in vehicle purchasing exercises. Again, the potential contractors were presented to Spizzirri for final approval. Noot organized a training call, and Spizzirri gave instructions to the contractors. He did not tell them that the data would be used as part of his expert report, nor did he provide any information about the conclusion he was trying to prove.

## 2. Survey Admissibility

Progressive argues that these two studies are not actually surveys but market research, and that the Court therefore does not have to evaluate them based on survey standards. It argues that the research is admissible and will help the jury. Plaintiffs respond that Spizzirri's research qualifies as surveys, that Spizzirri is unqualified to conduct such surveys, and that the surveys are flawed and do not meet the standard for introducing survey evidence. They also argue the surveys compile inadmissible hearsay and should be excluded on that basis as well.

As an initial matter, Spizzirri's "market research" constitutes surveys, and they will be analyzed as such. Black's Law Dictionary defines a survey as "[a] poll or questionnaire, esp. one examining popular opinion." SURVEY, Black's Law Dictionary (11th ed. 2019). Both the NADA study and the virtual studies meet this definition. Indeed, even Spizzirri himself called the same studies "surveys" in a deposition for a related case. [146-3] at 13:24. The fact remains that Spizzirri asked a target population questions to obtain data from them.

These are classic surveys, and Progressive's attempt to evade survey

standards by using the words "market research" fails.

When assessing the admissibility of survey evidence, there are

several considerations courts keep in mind such as whether:

> (1) "the population was properly chosen and defined;" (2) "the
> sample chosen was representative of that population;" (3) "the
> data gathered were accurately reported;" (4) "the data
> analyzed were in accordance with accepted statistical
> principles;" (5) "the questions asked were clear and not
> leading;" (6) "the survey was conducted by qualified persons
> following proper interview procedures;" and (7) "the process
> was conducted so as to ensure objectivity."

*Ass Armor, LLC v. Under Armour, Inc.*, No. 15-cv-20853-CIV, 2016 WL

7156092, at *2 (S.D. Fla. Dec. 8, 2016) (quoting 11.493.

Sampling/Opinion Surveys, Ann. Manual Complex Lit. § 11.493 (4th

ed.)). Technical flaws in surveys typically go to the weight of the

evidence, not its admissibility. *Jellibeans, Inc. v. Skating Clubs of Ga.,

Inc.*, 716 F.2d 833, 844 (11th Cir. 1983) (noting that a survey's "alleged

technical deficiencies affect the survey's weight, however, and not its

admissibility.").

But surveys must still satisfy Federal Rule of Evidence 703 to be

admissible. *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1321

(N.D. Ga. 2008) (noting that "[w]hether a given survey constitutes

acceptable evidence depends on the survey's ability to satisfy the demands of Federal Rule of Evidence 703, which requires consideration of the 'validity of the techniques employed'") (citation omitted). When evaluating surveys, the Rule 703 inquiry shifts from whether the evidence is of a type reasonably relied upon by experts to "Was the poll or survey conducted in accordance with generally accepted survey principles, and were the results used in a statistically correct way?" 364 FED. JUD. CTR., REFERENCE MANUAL ON SCI. EVIDENCE (3d ed. 2011) 359.

The surveys here have several major flaws in the validity of the scientific techniques, and thus the Court will grant Plaintiffs' motion to exclude.

### a.    Qualification

"To fulfill its role as a gatekeeper, the trial court must determine whether the expert has the requisite qualifications to offer the opinions [he] gives." *Hi-Tech Pharms. Inc. v. Dynamic Sports Nutrition, LLC*, No. 1:16-cv-949-MLB, 2021 WL 2185699, at *14 (N.D. Ga. May 28, 2021) (quotation omitted). The actors running these surveys—Spizzirri and Noot—are not sufficiently qualified in survey design or execution.

While Spizzirri has been "involved" in a few surveys while at car dealerships, he repeatedly admitted that he is not an expert in survey design or execution. *See, e.g.*, [146-3] at 98:3 ("I am not an expert in doing surveys."). Noot is a journalism and marketing agency that lacks expertise in survey design or execution. Although Progressive argues that Spizzirri delegated the execution of the surveys to Noot to avoid biasing the results by executing the survey himself, it does not explain why Spizzirri did not choose a contractor with more survey experience.

Progressive's reference to *Taylor v. Trapeze Management, LLC*, No. 0:17-cv-62262-KMM, 2019 WL 1977514, at *2 (S.D. Fla. Feb. 28, 2019), is inapt; in that case, the court held that an expert "in the field of marketing research and conducting survey evidence" who "has conducted over 500 secondary research projects and 6,000 focus groups" was qualified to conduct a survey. Spizzirri's background and survey experience is nowhere near that extensive, and *Taylor* therefore does not support Progressive's position.

Simply put, neither Spizzirri nor Noot is qualified in survey design and execution. *See Fed. Trade Comm'n v. Nat'l Urological Grp., Inc.*, No. 1:04-cv-3294-CAP, 2017 WL 6759868, at *43 (N.D. Ga. Oct. 10, 2017)

25

(excluding expert as unqualified to design and execute a survey based on her own admission that she was not an expert in survey design or analytics), *aff'd*, 786 F. App'x 947 (11th Cir. 2019); *Smartrend Mfg. Grp. (SMG), Inc. v. Opti-Luxx, Inc.*, No. 1:22-cv-915, 2023 WL 9058399, at *2 (W.D. Mich. Oct. 25, 2023) (holding that expert was not qualified to design the survey because his experience was in patents, not survey design).

### b.    Representative Sample

Next, we turn to whether Spizzirri sampled the proper "universe" in his surveys. "The universe is that segment of the population whose perceptions and state of mind are relevant to the issues in the case." *Atlanta Allergy & Asthma Clinic, P.A. v. Allergy & Asthma of Atlanta, LLC*, 685 F. Supp. 2d 1360, 1373 (N.D. Ga. 2010) (citations omitted).

Selection of a proper universe is vital to a survey's reliability. *See Smith*, 537 F. Supp. 2d at 1323 ("Selection of a proper universe is so critical that 'even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant.'") (quoting *Wells Fargo & Co. v. WhenU.com, Inc.,* 293 F. Supp. 2d 734, 767 (E.D. Mich. 2003)).

Plaintiffs argue that Spizzirri's universe is inappropriate for several reasons. First, Plaintiffs contend that Spizzirri did not take proper care to ensure that the universe was representative.

With the NADA survey, Spizzirri did not select the respondents; he let the freelance pollsters, chosen by Noot and confirmed by Spizzirri, choose whom to interview. Pollsters were told to identify respondents based on whether they were wearing NADA dealer badges from the convention. The survey questions that the pollsters were instructed to ask also did not include any screening questions for respondents.

Plaintiffs argue that this method of selection did not adequately ensure that the respondents were part of the relevant population for this litigation, i.e., that the respondents "both worked for a dealership in used car sales and could speak to its pricing practices." [162] at 13 (emphasis omitted).

As for the virtual survey, Plaintiffs argue that Spizzirri should have included non-franchise dealerships in its target audience and that Spizzirri should have included screening questions.

In response, Progressive posits that Spizzirri targeted franchise only dealerships because "it is undisputed that independent dealers . . .

are more likely to negotiate on price than franchised dealers." [158] at 19.

The relevant universe for these surveys is car dealers with experience selling used vehicles. The Court agrees with Plaintiffs that Spizzirri did not adequately screen the respondents to ensure they had experience selling used vehicles, so the universe is potentially overbroad. But Plaintiffs do not actually cite any instance in which a particular respondent was improperly included. It is also unlikely that the inclusion of a car dealer who does not have experience selling used vehicles would significantly corrupt the survey results. *See Navarro v. Procter & Gamble Co.*, No. 1:17-cv-406, 2021 WL 868586, at *19 (S.D. Ohio Mar. 8, 2021) ("An overbroad universe renders a survey inadmissible only when it is so 'significantly' overinclusive that it no longer provides any insight into the relevant population."). This factor therefore does not weigh in favor of exclusion.

### c.    Validation

Plaintiffs next argue that Spizzirri's surveys are unreliable because they were never validated and are incapable of validation.

28

Validation of surveys is a standard practice that increases a survey's reliability. *See* REFERENCE MANUAL at 417 ("To verify that interviews occurred with qualified respondents, standard survey practice includes validation procedures."). To validate an interview survey, "respondents in a sample are recontacted to ask whether the initial interviews took place and to determine whether the respondents were qualified to participate in the survey." *Id.*

Spizzirri did not validate his survey, and he did not collect enough identifying information from respondents to make the surveys capable of verification.

For example, in the NADA survey the contractors collected scant identifying information/contact information from the respondents.[4] Further, for the respondents that *did* have contact information, no one ever contacted respondents to validate their responses. This lack of validation is made worse considering that neither Spizzirri nor Noot supervised the initial data collection.

---

[4] Many of these forms include only a first name or a dealership name, with no contact information or location information. Further, much of the information collected, which is handwritten, is unintelligible. *See generally* [162-1].

While the virtual survey fares slightly better because the spreadsheet identifies the name and location of the dealership and the vehicle at issue, it still falls short because the actual respondents were identified only by their first names. It would be extremely difficult to verify these accounts. Again, there was no supervision by Spizzirri or Noot.

These surveys are not validated and do not contain enough identifying or contact information to be capable of verification. This strongly suggests that the surveys are unreliable. *See Ill. Tool Works Inc. v. Rust-Oleum Corp.*, No. cv-H-17-2084, 2018 WL 5810327, at *5 (S.D. Tex. June 21, 2018) ("The Court finds the 48% validation failure rate strongly indicates the Survey is unreliable."); *Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1218 (7th Cir. 1997) (holding that district court did not commit clear error by excluding expert's survey based in part on its failure to "comport with accepted practice for independent validation of the results.").

### d.    Bias

Plaintiffs next argue that bias permeated Spizzirri's surveys. First, Plaintiffs posit that both Spizzirri and Noot knew the purpose of

the survey when designing and executing it—to be used as evidence in support of Progressive in the nationwide litigation relating to the PSA issue—and were motivated towards a certain outcome.

Plaintiffs also argue that Spizzirri and Noot biased the surveys by rerunning the virtual survey for dealers who said that they did not negotiate. These results, however, were not included in Spizzirri's final report. Plaintiffs also argue that the surveyors were not objective.

Most notably, Plaintiffs object to the questions asked. They argue that the questions were "vague and irrelevant . . . in ways that were designed to solicit the desired response." [146] at 23. In the virtual survey, the surveyors included irrelevant factors such as financing and trade-in vehicles when asking about dealers giving discounts. And in the NADA survey, Plaintiffs argue that the emphasis on "strict" in the first question about one-price policies is too narrow.

The Court is troubled by these significant flaws in Spizzirri's surveys, particularly the wording of the questions. It is plain to see that the dealers' answers about whether they discount prices in selling used cars could encompass incidents where they reduce prices based on financing, trade-ins, or discounts. These types of discounts are not

relevant to the issues regarding PSAs in this litigation. There is a significant likelihood that the wording of these questions could have biased the survey results such that they appeared to indicate that dealers negotiate on price based on irrelevant factors, and thus the survey results could mislead the jury. This is another significant factor undermining the admissibility of Spizzirri's surveys. *See C. A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049, 1054 (5th Cir. 1981) (per curiam) (holding that district court "correctly excluded the customer survey as irrelevant" when survey evaluated customer goodwill which was not germane to determination of lost profits); *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 297 (2d Cir. 1999) ("The District Court correctly found however, that a survey may be kept from the jury's attention entirely by the trial judge if it is irrelevant to the issues) (quotation omitted); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 581 (S.D.N.Y. 2007) ("[A] survey 'should be excluded under Rule 403 when it is so flawed in its methodology' that the survey proves little and the jury is very likely to be misled." (quoting *Cache, Inc. v. M.Z. Berger & Co.*, No. 99-civ-12320-JGK, 2001 WL 38283, at *6 (S.D.N.Y. Jan. 16, 2001))).

### e.    Execution

Plaintiffs lastly contest that the surveys accurately collected and reported the data. They base this assertion on the previous issues discussed: the additional rounds of surveys, the possible tainting of answers about negotiating prices based on irrelevant factors, and the impossibility of validating the survey responses. Plaintiffs also point out that the surveys were not executed as Spizzirri designed them, considering that most of the respondents to the NADA surveys only answered the first question and left the other questions unanswered.

On its own, this objection would go to the weight of the survey, not its admissibility. *D. H. Pace Co. v. Aaron Overhead Door Atlanta LLC*, 526 F. Supp. 3d 1360, 1380 (N.D. Ga. 2021) ("Once again, to the extent there are flaws in the survey design, they go to the survey's weight, not its admissibility.").

But this objection is not solo; it is one of many, serious flaws in Spizzirri's surveys. Spizzirri himself says so: in his deposition, he disclaimed that the surveys were scientifically valid. *See* [146-3] at 100:24–101:12.

33

The Court has seen enough. Spizzirri's surveys are unreliable, unhelpful, and must be excluded.[5]

## C.   Dr. Jonathan Walker

Plaintiffs also move to exclude certain parts of the testimony of Progressive's expert Dr. Jonathan Walker. Dr. Walker is an economist, and Progressive has retained him to testify on four issues: (1) economic evidence of Plaintiffs' injuries; (2) whether there is common proof of Plaintiffs' injuries and to measure Plaintiffs' damages accurately; (3) whether Plaintiffs' expert, Dr. Lacey, has shown that injuries and damages are capable of common proof; and (4) whether Plaintiffs' experts have shown that all class members were injured. [156] at 6.

Plaintiffs are not seeking to completely exclude Dr. Walker's opinions. Rather, they argue that he should be precluded from testifying on (1) appraising a vehicle's ACV; (2) the used car industry and the pricing of used cars; and (3) a study he conducted concerning the accuracy of the PSA.

---

[5] Because the surveys will be excluded based on their own substance, the Court need not delve into the intricacies of the parties' arguments regarding whether the surveys are hearsay. But for the record, the surveys would not have been admissible under Federal Rule of Evidence 703 because their probative value would not have substantially outweighed their prejudicial effect.

### 1.    Appraising a Vehicle's ACV

Plaintiffs argue that Dr. Walker ought to be excluded from testifying about appraising the ACV of used vehicles because he is unqualified to do so. Plaintiffs oppose his testifying on methodology for appraising a vehicle's ACV generally and more specifically, his testimony on guidebook valuations such as the Kelley Blue Book ("KBB") and the National Automobile Dealers Association guidebook ("NADA guidebook").

### a.    General Appraising Methodology

Plaintiffs contend that Dr. Walker should be excluded from testifying on the ACV of Plaintiffs' vehicles because he is not an expert in valuing used vehicles. They argue against this testimony generally[6] and cite several specific instances they would like to be excluded.

### i.    WCTL Analysis

First, Plaintiffs challenge Dr. Walker's opinions about an analysis he performed on vehicles' base values.[7] In this analysis, Dr. Walker

---

[6] Plaintiffs do not cite specific testimony beyond the two sections described below. Accordingly, the Court will limit its analysis to the specific sections referenced.

[7] *See* Walker report, [148-2] at 16–17, ¶¶ 39–41.

"compares Progressive's valuations, which rely on PSAs, to the prices of similar comparable vehicles without PSAs." [156] at 10. Importantly, Dr. Walker states that he compares the vehicles to "one or more comparable vehicles' prices." [148-2] at 17, ¶ 41. Plaintiffs object to comparing the vehicle to just one other vehicle.

Plaintiffs challenge these opinions two-fold. First, they assert that Dr. Walker's methodology is substantively wrong because simply comparing a vehicle to the lowest-valued vehicle in the report (which is what they argue Dr. Walker's analysis is doing) is not an accurate depiction of a vehicle's ACV. Plaintiffs argue that appraisal standards, Progressive's own methodology, and Georgia law require more than one comparative vehicle. Plaintiffs also argue that Dr. Walker is not qualified to opine on this subject in general because he is not an expert in car valuations, regardless of whether he is right or wrong.

The Court agrees with Plaintiffs that Dr. Walker may not opine on a vehicle's ACV through this WCTL analysis. Progressive attempts to couch Dr. Walker's opinion as one relating to "injury and damages" because the measure of damages in this case is the amount Progressive paid insureds less than their vehicles' ACV. But that framing does not

change the fact that when Dr. Walker discusses class members'

damages, he discusses class members' vehicles' ACVs. Yet Dr. Walker

has explicitly conceded that he is not an expert in car valuations. *See*

[89-2] at 16:12–18 (stating that he is not a professional appraiser nor

has experience working in a new car dealership). Therefore, he cannot go

before the jury and opine on whether Progressive accurately (or

"reasonably")[8] valued Plaintiffs' vehicles because he admitted that he

does not know how to do that. The Court agrees with Plaintiffs' framing:

"If someone cannot opine on the ACV of a vehicle, they necessarily

cannot opine on whether a payment was (or was not) less than the ACV."

[163] at 4. Just because this issue relates to whether Plaintiffs were

injured does not automatically bring it into the purview of Dr. Walker;

he still must have expertise in valuing used vehicles to opine on the

correct measure of a vehicle's ACV, and he does not have this expertise.

The Court also finds that Plaintiffs raise significant concerns about

the propriety of Dr. Walker's analysis. Georgia law requires using at

least two comparator vehicles. Ga. Comp. R. & Regs. 120-2-52-.06(a).

---

[8] The Court agrees with Plaintiffs that Progressive's use of the term
"reasonable" is misleading as there is not a "reasonable" range of values that would
protect Progressive from liability: either it underpaid Plaintiffs or it did not.

Progressive's own appraisal expert, David Kinney, testified that appraisal standards require at least three, and he would never use just one. [89-1] at 66:12–20. These sources cast serious doubt on the validity of Dr. Walker's using just one vehicle to compare.

The cases Progressive cites are inapposite. In *Maiz v. Virani*, 253 F.3d 641 (11th Cir. 2001), the Eleventh Circuit held that the district court did not abuse its discretion in allowing an expert economist to testify as to the plaintiffs' lost value damages when the expert had no subject-matter expertise. The situation here is distinct from *Maiz* because the court in that case found that the expert's damages calculation was undergirded by a valid comparator. Here, the Court has significant doubts regarding the validity of Dr. Walker's WCTL analysis. So, not only is Dr. Walker working outside of his subject-matter expertise, but the foundation for his analysis is not reliable enough.

The other cases are similarly distinguishable. The economist at issue in *United States v. 0.161 Acres of Land, more or less, situated in City of Birmingham, Jefferson County, Alabama*, 837 F.2d 1036 (11th Cir. 1988), had much more background in the case's subject-matter than Dr. Walker has with the used-car market. *Id.* at 1041 ("Schaffer's study

of other downtown real estate sales, his considerable training as an economist, his familiarity with the local real estate market and his previous studies support his ability to testify as an expert concerning the value of the courthouse property.").

And the expert economist in *Voilas v. General Motors Corp.*, 73 F. Supp. 2d 452 (D.N.J. 1999), was not testifying about valuing any vehicles but rather evaluating GM's plans about keeping a plant open. This type of business analytics is obviously more within an economist's purview than valuing used vehicles. *Id.* at 457 (holding that just because the economist "does not have specific experience in the automotive industry or in creating or evaluating business plans does not impact upon his qualifications to review such plans and to summarize in a concise, easy to understand fashion GM's own analyses of the business options available to it.").

In sum, these cases are each distinct from this issue before the Court, as the experts in those cases either had a more reliable foundation, had more expertise in the subject matter, or were performing a different type of analysis.

Because Dr. Walker is not qualified to evaluate a used vehicle's ACV and because the Court has serious doubts about the validity of his WCTL analysis, he will be precluded from testifying on that study.

### ii.    Response to Merritt

Plaintiffs also challenge Dr. Walker's rebuttal testimony to Plaintiffs' appraisal expert Merritt in this section. *See* Walker report, [148-2] at 59–61, ¶¶ 145–51. They contend that Dr. Walker does not offer any opinions based on his expertise as an economist but rather simply criticizes Merritt's opinions, which is a job for Progressive's counsel during cross-examination at trial.

The Court agrees. Dr. Walker's testimony in this section attacks Merritt's opinions and delves into practices of the used-car industry. This is outside the scope of his expertise as an economist and his role in this litigation. His opinions responding to Merritt will be excluded.

### b.    Guidebook Values

Plaintiffs also object to Dr. Walker's discussion of guidebook values such as KBB or NADA guidebook valuations.

Dr. Walker mentions these guidebook values once in his report:

NADA and KBB data cast further doubt that Ms. Bost was injured. The NADA Clean Retail Value and KBB Certified

Report Value for similar vehicles to Ms. Bost's loss vehicle were $6,800 and $4,710 respectively. NADA and KBB prices are not specific valuations of any vehicle, but they are sometimes used as a starting point in a vehicle valuation. The fact that Ms. Bost's WCTL valuation was higher than both of these guideline prices highlights the need for individualized consideration of Ms. Bost's vehicle and circumstances to conclude that she was economically injured by Progressive's reliance on PSAs.

[148-2] at 19–20, ¶ 50. In a footnote, Dr. Walker's report also explains that "[a]mong other shortcomings, NADA and KBB do not fully account for current supply and demand conditions in the local area of the loss vehicle, vehicle condition and certain options and features." *Id.* at 20, n.68.

Plaintiffs make two arguments against the guidebook values: (1) the values are inadmissible hearsay, and (2) the values are irrelevant.

### i.    Hearsay

Plaintiffs assert that the guidebook values are inadmissible hearsay and that Dr. Walker should not be allowed to discuss them. Progressive counters that the guidebook values should be admitted under Federal Rule of Evidence 803(17), the hearsay exception for

market reports and commercial publications, or under Federal Rule of Evidence 703 because economists regularly rely on these valuations.

Rule 803(17) allows "[m]arket quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations" to be admitted as exceptions to the rule against hearsay. The Advisory Committee Notes list newspaper market reports, telephone directories, and city directories as examples of publications that are admissible under this rule.

There is a delineation in the case law between admissible reports that convey a collection of objective facts versus inadmissible conclusions reached after analysis. *See Bianco v. Globus Med., Inc.*, No. 2:12-cv-00147-WCB, 2014 WL 119285, at *1 (E.D. Tex. Jan. 12, 2014) ("The courts have generally taken a similarly narrow view of the scope of Rule 803(17), applying it to compilations of data, not to narrative and potentially subjective assessments in either general or specialized publications."). For example, the court in *JIPC Management, Inc. v. Incredible Pizza Co.*, No. cv-08-04310-MMM PLAX, 2009 WL 8591607, at *24 (C.D. Cal. July 14, 2009) excluded reports that a marketing company created to document the exposure a company received during televised

broadcasts because the reports did "not appear to be objective compilations of easily ascertainable facts of the sort contemplated by the [r]ule; rather, they contain conclusions reached after analysis by a specialized marketing research company." The court noted that the reports were prepared specifically for an interested party and was not a generalized publication for a certain trade.

The guidebook values here are more like an individualized report than a collection of objective facts like a phone book directory. Further, the central issue in this class action is the actual cash value of the insureds' vehicles, and the propriety of the guidebook values is a primary question to be resolved. These guidebook values do not gain automatic admission status simply because they involve data points. Accordingly, Rule 803(17) is not an appropriate avenue for admission.[9]

Next, Rule 703 allows for the admission of otherwise inadmissible evidence if "experts in the particular field would reasonably rely on

---

[9] It is true that bankruptcy courts have admitted KBB/NADA guidebook values under this exception. *See, e.g.*, *In re Callier*, No. 22-30002-SDB, 2023 WL 6416398 (Bankr. N.D. Ga. Sept. 29, 2023); *In re Best*, No. 18-58958-PMB, 2018 WL 6060316 (Bankr. N.D. Ga. Nov. 19, 2018). The Court, however, finds that bankruptcy cases are distinct in that the gravamen of a bankruptcy case is not the source of the information, as it is here. Accordingly, the Court finds this authority not directly relevant to this case.

those kinds of facts or data in forming an opinion on the subject." The rule qualifies that the expert may disclose otherwise inadmissible evidence only if its "probative value in helping the jury evaluate the opinion substantially outweighs [its] prejudicial effect."

To start, it is unclear why Dr. Walker would "reasonably rely" on these guidebook values as the basis of his opinion. Even if economists can rely on the guidebooks in certain contexts, here Dr. Walker's comments on the NADA and KBB values amount to him comparing the guidebook values to Plaintiff Bost's WCTL value. There is no specialized economic analysis involved, and it reads as though he is simply parrots the guidebook values as alternative proxies for ACV relating to determining damages. *United States v. Dukagjini*, 326 F.3d 45, 59 (2d Cir. 2003) (excluding expert's testimony because he was "repeating hearsay evidence without applying any expertise whatsoever, thereby enabling the government to circumvent the rules prohibiting hearsay.").

Everyone, including Progressive, acknowledges that the guidebook values cannot be a proxy for ACV. Though Dr. Walker styles his discussion as relating to Plaintiffs' individualized injuries, this still relates to vehicles' ACV because that is what damages are based on.

Even the parties' expert appraisers, Kinney and Merritt, do not comment on the guidebook values in their expert testimonies.

In any event, the Court finds that Dr. Walker's discussion of the guidebook values would be more prejudicial than probative, and that testimony therefore does not pass muster under Rule 703. The testimony would complicate the issues before the jury and improperly confuse them on the role the guidebook values should play in evaluating a vehicle's ACV. Even Dr. Walker's footnote qualifying the usefulness of the guidebook values does not save his discussion of them.

Accordingly, the KBB and NADA guidebook values are hearsay and are not admissible under any Federal Rule of Evidence. Dr. Walker's opinions about these guidebook values will be excluded.

### ii.    Relevance

Plaintiffs also argue that the guidebook values are not relevant to Dr. Walker's testimony because the values do not constitute evidence of a vehicle's ACV.

The Court agrees that the guidebook values are not relevant to Dr. Walker's testimony, and he will not be allowed to testify on them. Dr. Walker is an economist—not an appraiser, not a used-car-industry

expert, not anything related to valuing used vehicles. He has specifically disavowed expertise in the valuation of used vehicles, and it is not his job to opine on whether Progressive correctly valued Plaintiffs' vehicles.

Progressive argues that Dr. Walker is an expert on damages, and here, damages depend on a vehicle's ACV. But Progressive has other experts, such as an appraiser, to opine on Plaintiffs' ACVs of their vehicles. It is striking to the Court that Progressive's appraiser, Kinney, does not even mention the guidebook values. It is too much of a stretch for Dr. Walker, an economist and self-proclaimed non-expert on car valuations, to opine on the reasonableness of Progressive's valuation of Plaintiffs' vehicles. His testimony would be unduly prejudicial and confusing to the jury and must be excluded on this point as well.

Accordingly, Dr. Walker's testimony about the guidebook values is misplaced and not relevant.

### 2.  Used-Car Industry

Plaintiffs next argue that Dr. Walker's opinions relating to the used-car industry ought to be excluded because Dr. Walker is not an expert in the used-car industry and does not offer any opinions based on his expertise.

To reiterate, Dr. Walker has never worked in the used-car industry and has no experience pricing used-vehicles.

First, Plaintiffs object to Dr. Walker's testimony against Plaintiffs' expert Kirk Felix. *See* Walker report [148-2] at 63–63, ¶¶ 153–58. Dr. Walker's testimony on this point mostly muses about the reasons discounts at dealerships occur, contradicting Felix's testimony. This is outside of his expertise as an economist, and Progressive's used-car industry experts are better equipped to offer this rebuttal testimony. The testimony reads like a cross-examination of Felix with Dr. Walker pointing out inconsistencies and attacking his opinions. This is a job for Progressive's counsel; Dr. Walker does not bring unique experience to this case as an economist. Nor does he cite any studies, research, or any type of outside support to back up his opinions on these topics, so it is difficult to know the source of his information.

The Court agrees that Dr. Walker is not qualified to respond to Plaintiffs' used-car industry expert, Felix, regarding the used-car industry. Accordingly, Dr. Walker's testimony on these points will be excluded.

Next, Plaintiffs seek to exclude Dr. Walker's opinion that the WCTL reports include upward bias in the insured's favor related to dealer-owned comparable vehicles. *See* Walker report, [148-2] at 8–10, §§ 22–24. He asserts that this is because "dealer-owned vehicles are generally in better than average condition than otherwise similar vehicles on the road in private use." [148-2] at 8, ¶ 22. Plaintiffs criticize this opinion because they argue it is simply speculation unsupported by any studies or data. They also argue that the WCTL reports account for this difference already. Progressive disputes that the WCTL reports account for this upward bias.

At this stage, it is irrelevant who is correct about the WCTL reports. Dr. Walker, as an economist with no background in car valuations, is not qualified to discuss the intricacies of how the WCTL reports value vehicles. Progressive should address this alleged deficiency on cross-examination of Felix or through its appraisal expert. This testimony will be excluded as well.

### 3.   PSA Study

As part of his analysis of class members' injuries, Dr. Walker looked at a sample set of transactions in the J.D. Power data set where

both the list and sold prices of vehicles were available, as well as the

PSA that would have been applied if the vehicle was used in a valuation.

Dr. Walker went through these numbers and compared the PSA to the

actual ratio between the list and sold prices. *See* [148-2] at 33–35,

¶¶ 76–86.

Plaintiffs contend that this study is irrelevant and would be

unhelpful to the jury and thus ought to be excluded. They base this

argument on a couple of problems. First, they argue that the study is

irrelevant because Progressive skewed the underlying data, and

therefore any analysis of the data is skewed. Specifically, Plaintiffs

allege that Progressive removed any transactions where a vehicle was

sold at or above list price and included only transactions where the

vehicle sold for less than the list price.

Plaintiffs next argue that Progressive did not investigate why the

vehicle sold for list price, i.e., whether other reasons such as financing,

specialized discounts, trade-ins, or purchase of other products

contributed to the lower sale price.

Plaintiffs note that they are not challenging the accuracy of the

study but the relevance. *See* [163] at 15 ("The problem with Dr. Walker's

49

analysis is not its correctness—presumably, he is correct that the subset of the manipulated data is consistent with the rest of the manipulated data. The problem is that it is pointless.").

The Court agrees with Plaintiffs that Dr. Walker's study is misleading, irrelevant and would be confusing to the jury.

The standard for relevance is whether the evidence "tend[s] to make a fact more or less probable than it would without the evidence." FED. R. EVID. 401(a). Though this is a low bar, Dr. Walker's study does not meet it. Progressive and Dr. Walker assert that this study shows that "applying a PSA is more accurate than assuming that the list price is always equal to the sales price," [156] at 25, and that "there is no basis to assume that PSAs harm class members." [148-2] at 34, ¶ 80. But if the underlying data does not include instances where a vehicle was sold for more than the list price, the study does not actually tend to make either of those propositions more or less true. In other words, the study does not actually tell us anything about the propriety of applying a PSA because it only looked at cases where applying a PSA would have aligned with the sales price.

For these reasons, the study is irrelevant and would confuse the jury. It will be excluded.

## IV.  Conclusion

Accordingly, Progressive's motion [143] to exclude portions of the report and testimony of Dr. Michelle Lacey is denied. The entirety of Dr. Lacey's report and testimony is admissible.

Plaintiffs' motion [146] to exclude portions of the report and testimony of Marc Spizzirri is granted. Spizzirri is not permitted to opine on the surveys, the survey results, or any conclusions reached because of the surveys. In particular, paragraphs 63–65 of his report are excluded.

Plaintiffs' motion [148] to exclude portions of the report and testimony of Dr. Jonathan Walker is granted as well. Dr. Walker is not allowed to discuss the following, as detailed above: (1) appraising a vehicle's ACV, including his WCTL analysis and opinions on guidebook values; (2) the used car industry and the pricing of used cars; and (3) his study concerning the accuracy of the PSA.

IT IS SO ORDERED this 26th day of July, 2024.

Timothy C. Batten, Sr.
Chief United States District Judge